UNITED STATES *v.* SAMPSON ET AL.

No. 69.   Argued October 18, 1962.—Decided November 19, 1962.

*Howard P. Willens* argued the cause for the United States.   On the briefs were *Solicitor General Cox, Assistant Attorney General Miller, Louis F. Claiborne* and *Philip R. Monahan.*

*Randolph W. Thrower* argued the cause for appellees. With him on the briefs was *D. R. Cumming, Jr.*

Mr. Justice Black delivered the opinion of the Court.

The appellees were indicted in a United States District Court on charges that they had used the mails "for the purpose of executing" a fraudulent scheme in violation of 18 U. S. C. § 1341 [1] and that they had conspired to so use the mails.[2] It is clear that the allegations, if proved, would show that a fraudulent scheme existed and that the mailings charged in fact occurred. The District Court dismissed 34 of the counts, however, on the ground that the facts alleged showed that the mails were not used "for the purpose of executing" the alleged scheme, as required by the statute. The court also dismissed the conspiracy count without giving additional reasons. The case is properly here on direct appeal by the Government under 18 U. S. C. § 3731. The only question we must decide with reference to the 34 substantive counts is whether the allegations in the indictment were sufficient to permit a jury to find that the mails were used "for the purpose of executing" the fraudulent scheme. Whether the indictment sufficiently charges that the mails were so used depends upon its allegations.

In brief summary, these allegations are:

The individual defendants were officers, directors, and employees of a large, nationwide corporation, also a

---

[1] "Sec. 1341. *Frauds and swindles.*

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, . . . or knowingly causes to be delivered by mail according to the direction thereon, . . . any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

[2] 18 U. S. C. § 371.

defendant, with regional offices in various States. The defendants purported to be able to help businessmen obtain loans or sell out their businesses. Although lavish promises were freely given, the defendants did not intend to and in fact did not make any substantial efforts to perform these promised services. As a part of this scheme, the defendants secured salesmen who were trained to deceive those with whom they dealt by innuendos, half-truths, and false statements.[3] These defendants, according to the allegations, were not mere small-time, sporadic swindlers but rather they have deliberately planned and devised a well-integrated, long-range, and effective scheme for the use of propaganda, salesmen, and other techniques to soften up and then cheat their victims one by one. Under the plan, personal calls were made upon prospects who were urged by false and fraudulent representations to sign applications asking defendants to help them obtain loans or sell their businesses. The salesmen further urged prospects, many times successfully, to give a check for an "advance fee," all being assured that if their applications were not accepted at the regional office the "advance fee" would be refunded. Payments of the fees were promptly converted by the salesmen into cashiers' checks on local

---

[3] "It was a further part of the said scheme and artifice to defraud that the defendants would secure salesmen . . . who would be agreeable to the use of unethical sales talks and hire and use them as field representatives, and it was a further part of the scheme to teach such salesmen that prospective victims were at a complete disadvantage and would jump and act like puppets if the salesman handled the client right, and to teach them to try and impress upon the victims that said salesman was an expert; to teach salesmen to try and confuse victims and to lead them into believing that LSC was a lending company . . . and to teach said salesmen that LSC and the defendants did not care how such salesmen sold a contract to a victim and that it was perfectly all right for a salesman to use innuendos and half-truths . . . ." Record, pp. 4–5.

banks and then forwarded with the applications to the corporate regional offices where all applications, as a part of the plan, were accepted if signed and accompanied by a check for the right amount. The fees were immediately deposited in the defendants' bank account. Although the money had already been obtained, the plan still called for a mailing of the accepted application together with a form letter to the victims "for the purpose of lulling said victims by representing that their applications had been accepted and that the defendants would therefore perform for said victims the valuable services which the defendants had falsely and fraudulently represented that they would perform."[4] It was further a part of the scheme to compile rudimentary financial data and forward it to various lending agencies and to inform the victims of this fact in an attempt to convince them that they had not been defrauded and that the defendants were performing meaningful services on their behalves. Moreover, under the plan defendants, while refusing to refund the fee, pretended to investigate complaints from their victims and encouraged their salesmen to deny having made false representations, all the time seeking by false and fraudulent statements to make the victims believe that the defendants had faithfully performed and would continue to perform the promised services. In short, the indictment alleged that the scheme, as originally planned by the defendants and as actually carried out, included fraudulent activities both before and after the victims had actually given over their money to the defendants. Of course, none of these charges have been established by evidence, but at this stage of the proceed-

---

[4] Record, p. 8. It was also charged that a further purpose of the mailing was to inform the victims that they could not obtain a refund of their fees, that the contract was not cancellable, and that the victim had no recourse for retrieving his money. *Ibid.*

ings the indictment must be tested by its sufficiency to charge an offense.

The use of the mails relied on in the 34 dismissed counts was the mailing by the defendants of their acceptances of the victims' applications for their services. As conceded by the Government, prior to each mailing of an acceptance to a victim the defendants had obtained all the money they expected to get from that victim. The district judge's reason for holding that these counts did not charge a federal offense was that, since the money had already been obtained by the defendants before the acceptances were mailed, these mailings could not have been "for the purpose of executing" the scheme. For this holding the court relied chiefly on *Kann* v. *United States*, 323 U. S. 88 (1944), and *Parr* v. *United States*, 363 U. S. 370 (1960).

In *Kann*, the defendants defrauded their corporate employer in matters confined to their local region. As a part of their scheme, the defendants had fraudulently obtained checks payable to them which were cashed or deposited at a bank. The use of the mails charged as a violation of the federal statute was the mailing of the checks for collection by the banks which cashed them to the banks upon which they were drawn. Prior to that mailing, the Court found, the defendants had obtained the money they sought, and as far as they were concerned their plan had reached its fruition and come to a complete rest. The scheme, as the Court viewed it, had contemplated no more. The mailing was done by outsiders, the banks, which had no connection whatsoever with the fraud. The checks were mailed for the banks' own purposes and not in any way for the furthering of the fraudulent scheme. In the Court's view it was immaterial to the consummation of the defendants' scheme how or whether the banks which had cashed the checks sought to collect them.

In *Parr,* the second case upon which the District Court relied, the defendants had obtained gasoline and other products and services for themselves by the use of the credit card of a School District which had authorized the defendants to use the card for the District's purposes only. The mailings complained of in the *Parr* case were two invoices sent by the oil company to the District and the District's check mailed back in payment. Again the Court was able to find that the mailings by the outsiders were not an integral part of the scheme as planned and executed by the defendants and that, as a matter of fact, it was completely immaterial to them what the oil company did about collecting its bill.

We are unable to find anything in either the *Kann* or the *Parr* case which suggests that the Court was laying down an automatic rule that a deliberate, planned use of the mails after the victims' money had been obtained can never be "for the purpose of executing" the defendants' scheme. Rather the Court found only that under the facts in those cases the schemes had been fully executed before the mails were used. And Court of Appeals decisions rendered both before and after *Kann* have followed the view that subsequent mailings can in some circumstances provide the basis for an indictment under the mail fraud statutes.[5]

Moreover, as pointed out above, the indictment in this case alleged that the defendants' scheme contemplated from the start the commission of fraudulent activities which were to be and actually were carried out both before and after the money was obtained from the victims. The indictment specifically alleged that the signed copies of

---

[5] See, *e. g., United States* v. *Lowe,* 115 F. 2d 596 (C. A. 7th Cir. 1940), cert. denied, 311 U. S. 717 (1941); *United States* v. *Riedel,* 126 F. 2d 81 (C. A. 7th Cir. 1942); *Clark* v. *United States,* 93 U. S. App. D. C. 61, 208 F. 2d 840, cert. denied, 346 U. S. 865 (1953).

the accepted applications and the covering letters were mailed by the defendants to the victims for the purpose of lulling them by assurances that the promised services would be performed. We cannot hold that such a deliberate and planned use of the United States mails by defendants engaged in a nationwide, fraudulent scheme in pursuance of a previously formulated plan could not, if established by evidence, be found by a jury under proper instructions to be "for the purpose of executing" a scheme within the meaning of the mail fraud statute. For these reasons, we hold that it was error for the District Court to dismiss these 34 substantive counts.

At the time the trial court dismissed the substantive counts it also dismissed the conspiracy count without stating additional reasons. In this Court, however, it is contended that the conspiracy count duplicates the 43 substantive counts because each substantive count is in reality a conspiracy count. On this basis, it is argued that there is an unjustified pyramiding of conspiracy counts which could be used by the Government in such a way as to deny the defendants, in particular the salesmen, a fair trial. We cannot anticipate arguments that would be more appropriately addressed to the trial court should the conduct or the result of the trial deny any of the defendants their rights. Since the conspiracy count on its face, like the substantive counts on their faces, properly charges a separate offense against each of the defendants, it was also error to dismiss the conspiracy count.

*Reversed.*

Mr. Justice Douglas, dissenting.

I think that today the Court materially qualifies *Parr v. United States*, 363 U. S. 370. There, in the face of the jury's verdict, we held that a check on a third party's

funds, mailed to pay for property after the property had been fraudulently "obtained," could not be "for the purpose of executing" a scheme to obtain the property. As the statute makes clear,[1] there is only one foundation for prosecution under the statute and that is using the mails "for the purpose of executing" the various schemes described in the Act. So far as is relevant here, those schemes are either to defraud or to obtain money by false or fraudulent representations.

It is possible that in this case indictments could be drawn which charge the use of mails *to lull existing victims* into a feeling of security so that a scheme to obtain money *from other victims* could be successfully consummated. The opinion does not so construe the indictment but concludes, as I read it, that the mere lulling of existing victims into a sense of security is enough.[2] If that is enough, then in the *Parr* case it would seem that we should have sustained the conviction because the defendants there may well have wanted the third party to pay for the property that had been fraudulently obtained so that they would not be apprehended. In the *Parr* case, as here, there was "a continuing course of conduct" (to borrow a phrase from the dissent, 363 U. S., at 402) not only to obtain money fraudulently but also to conceal the fraud so that future peculations might be possible. In *Parr,* future peculations from the same taxpayers were part of the scheme. Here there is no suggestion that those pre-

---

[1] "Whoever, having devised . . . [a] *scheme . . . to defraud,* or *for obtaining money* . . . by means of false or fraudulent . . . representations, or promises, . . . *for the purpose of executing such scheme* . . . places in any post office . . . any matter . . . to be sent . . . by the Post Office Department . . . shall be [guilty of a crime] . . . ." (Italics added.) 18 U. S. C. § 1341.

[2] The indictment, as I read it, charges on this phase only "lulling said victims" into a sense of security.

viously defrauded were to be defrauded a second time.[3] The mails were used only to tranquilize those already defrauded. Or at least that is the only way I can read this indictment. It is therefore a much weaker case than *Parr*.

We should not struggle to uphold poorly drawn counts. To do so only encourages more federal prosecution in fields that are essentially local.

---

[3] The Solicitor General states in his brief:

"The government conceded that, after obtaining the advance fee, the defendants had no intention of earning the balance due on the service contracts. No further payments were expected to be got from the victim."