**UNITED STATES of America, Appellee,**

v.

**Robert S. KELEM, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Barnett GARTRELL, Appellant.**

**Nos. 23165, 23166.**

United States Court of Appeals Ninth Circuit.

Sept. 22, 1969.

Rehearing Denied in No. 23166 Nov. 5, 1969.

Carl E. Stewart, Los Angeles, Cal. (argued), Barnett Gartrell, in pro. per., for appellants.

Gerald F. Uelmen, Asst. U. S. Atty. (argued), Wm. Matthew Byrne, Jr., U. S. Atty., David R. Nissen, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before ELY, CARTER, and HUF-STEDLER, Circuit Judges.

ELY, Circuit Judge:

Following their convictions of several offenses under the mail fraud statute, 18 U.S.C. § 1341, Kelem and Gartrell brought appeals which we have consolidated. They insist that the statute does not proscribe the particular fraud which they practiced.

■ It is elementary that the jurisdiction of federal courts is defined and limited by the Constitution and congressional action; hence, statutes such as section 1341 should be carefully and strictly construed in order to avoid extension beyond the limits intended by Congress. Healy v. Ratta, 292 U.S. 263, 270, 54 S.Ct. 700, 78 L.Ed. 1248 (1933); Kline v. Burke Constr. Co., 260 U.S. 226, 233–234, 43 S. Ct. 79, 67 L.Ed. 226 (1922). Moreover, such construction is especially appropriate where, as here, the Government urges that we construe a federal criminal statute so that it reaches conduct which the states should appropriately control and which they can control, effectively. Indeed as the Supreme Court has emphasized, section 1341 is not designed to reach all frauds "but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law." Kann v. United States, 323 U.S. 88, 95, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944); *see also* Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1962). While fully mindful of the above principles, we have nevertheless concluded that the record herein reveals a fraudulent scheme which would not have been successfully conducted without mailings which the appellants caused, and that, accordingly, we must affirm.

■ Kelem operated a "Discount Store" where he sold all types of merchandise, including airline tickets at 85% of their face value. Kelem's customers believed that these discounts were made

possible through supposed "due bill trades," under which airlines provided transportation in exchange for radio and television advertising. In fact, however, upon learning of a customer's transportation needs, Kelem would request Gartrell or one of his other associates to purchase the ticket. Kelem's associate would obtain the ticket by charging its cost to a credit card issued in the associate's true name. These individuals never paid the bills rendered pursuant to the credit which was extended; hence, they returned significant profits when, according to their arrangement with Kelem, he would, for his unsuspecting customers, purchase the tickets from them at 65% of their face value.

This scheme continued for nearly one year. Kelem, requiring a constant supply of tickets, continuously recruited new "purchasers" to replace associates whose credit cards were confiscated because of large unpaid balances which quickly accrued. The magnitude of the enterprise is evidenced by the fact that approximately $117,000 worth of airline tickets were purchased, on credit, by only six of the participating card holders. One of these, Simon, a co-defendant below, used his Carte Blanche credit card to obtain tickets valued at $22,077.65. Another, one Gould, using a United Airlines credit card, obtained tickets of the full value of $14,065.25. A co-defendant named Sampson used his American Express Company card for credit totaling $11,-565.44. Two of Kelem's recruited associates, Weinstein and Payne, used their United Airlines and Diner's Club cards to obtain over $50,000 worth of tickets, and the appellant Gartrell procured more than $20,000 worth of tickets on the strength of credit cards issued to him personally. The ability of the various individuals to amass such large balances before their credit was revoked resulted from collection procedures employed by the victimized companies, A part of this procedure was designed to prevent the excessive misuse of the credit cards. There was a

fixed ceiling amount over which no charge could be made without the credit company's authorization being obtained through a telephone call. However, as the record clearly discloses, Kelem and his associates knew of this practice and consequently avoided making purchases of such amounts as to initiate it. They "spread" their purchases among many travel agents to avoid arousing suspicion, and if a ticket for travel between significantly distant points exceeded the ceiling, they would make several separate purchases and then trade the combined tickets for the single trip. Each ticket transaction was recorded on a standard sales invoice on which the selling agent imprinted the purchaser's credit card.

By avoiding the ceiling limit and spreading their purchases, the schemers intended that their charges would be normally processed by the mailing of the invoices, sometime after each ticket purchase, to the airline concerned with the particular ticket. If the ticket was obtained by credit extended on that airline's credit card, there were no more mailings; however, this simple transfer would delay processing of the charge to an account for billing for an average of seven or eight days. If, on the other hand, the tickets were obtained with a credit card issued by one of the credit card companies, the airline, after receiving the invoices from the sales agents, would mail the invoices to the credit card companies for payment, and the ensuing delay would run to a period of between three and eight weeks.

The mail fraud statute is violated if an individual participates in a scheme which "causes" mail to be delivered "for the purpose of executing [a fraudulent] scheme." 18 U.S.C. § 1341. Here, there is no dispute over the fact that the appellants devised and participated in a scheme to defraud airline and credit card companies. Accordingly, our inquiry is limited to whether the mailings were "caused" by the appellants and if so caused, whether these mailing were "for

the purpose of executing [the] scheme" within the meaning of section 1341.

In Pereira v. United States, 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954), the Supreme Court held that one "causes" a mailing under section 1341 if he does an act with the knowledge that the use of the mails will follow in the ordinary course of business. We, of course, have no power to depart from, or to ignore, that interpretation. Here, as previously explained, the appellants purposely followed a course of conduct designed to invoke the mailing procedures of the credit card companies; therefore, under *Pereira*, the mailings were "caused" by the appellants.

On the question of whether the evidence supports a determination that the mailings were "for the purpose of executing [the] scheme," the appellants rely upon Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), and Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). In those two cases, the Supreme Court reversed mail fraud convictions because the mailing had occurred *after* the object of the fraud had been accomplished. Emphasizing this, the appellants argue that the purpose of their scheme was to obtain airline tickets and that this objective having been accomplished before the mailings occurred, the mailings cannot be held to have been "for the purpose of executing [the] scheme."

In *Parr*, a Texas political figure, one Parr, and several co-defendants were charged with having participated in a scheme to milk funds from a local school district. Parr was president of the bank in which the victim's funds were deposited, and his associates controlled the district. The associates caused checks to be issued to themselves under fictitious names for services purportedly rendered, or material supposedly furnished, to the district, and Parr's bank, often without even requiring a forged endorsement, willingly honored the drafts. During the life of the scheme, two of the co-defend-

ants who controlled the district used the district's credit cards to make two purchases of gasoline products for their personal use. The Government prosecuted these individuals under the mail fraud statute, and they were convicted. The Supreme Court reversed their convictions, reasoning that the mailing of the sales invoices which reflected these charges could not be held to have contributed to the defendants' ability to obtain the gas products. The Supreme Court thereupon concluded that the mailings were not for the purpose of executing the scheme. 363 U.S. at 393, 80 S.Ct. 1171.

*Kann* also presented a situation wherein the defendants bilked large sums of money from a corporation which they controlled. Essentially, the scheme was the same as that in *Parr*. The defendants, through their control, caused the victim to issue checks to another corporation, owned by the defendants, for services which that payee had purportedly rendered. The mailings on which the Government based its section 1341 prosecution occurred when the bank where the defendants cashed the checks forwarded the instruments to the bank in which the victimized company's funds were deposited and on which the checks were drawn. The Supreme Court held that these interbank mailings, occurring after the defendants had irrevocably received the proceeds of their fraud, did not sufficiently contribute to the success of the scheme.

In our judgment, *Kann* and *Parr* cannot stand for appellants' broad proposition that whenever, through deception, an individual receives that which he has set out to obtain, he cannot be prosecuted under section 1341, regardless of whatever use of the mails may have occurred thereafter. The two cases must be read with, and considered in the light of, the Supreme Court's later opinion in United States v. Sampson, 371 U.S. 75, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962). There, the defendants had secured advance payments for services which they never intended to perform. When they there-

after mailed their victims notices which were designed to continue the illusion that the services would eventually be performed, the Government prosecuted under section 1341. The District Court dismissed the prosecution upon its interpretation of *Parr* and *Kann* in the manner urged by the appellants in this case. The Supreme Court reversed and declared:

> "We are unable to find anything in either the *Kann* or the *Parr* case which suggests that the Court was laying down an automatic rule that a deliberate, planned use of the mails after the victims' money had been obtained can never be 'for the purpose of executing' the defendants' scheme. Rather the Court found only that under the facts in those cases the schemes had been fully executed before the mails were used. And Court of Appeals decisions rendered both before and after *Kann* have followed the view that subsequent mailings can in some circumstances provide the basis for an indictment under the mail fraud statutes."

371 U.S. at 80, 83 S.Ct. at 176.

More recently, in Suhl v. United States, 390 F.2d 547 (9th Cir. 1968), our own court has written:

> "Reliance on *Kann* is misplaced. That case involved fraudulent diversion of corporate funds, the scheme being complete when the corporation's checks were cashed. The bank's later use of the mails to collect the checks was irrelevant to the scheme and was thus held to be an insufficient basis upon which to base a mail fraud conviction. The Court specifically distinguished cases where use of the mails is an integral part of the scheme. 323 U.S. at 94–95 [65 S.Ct. 148]. In the present case, an essential part of the charged transaction was the delay incident to the necessity of mailing the Gibson checks to Covelo. This delay enabled Suhl to deal in Royal Properties stock with non-existent funds."

*Id.* at 552–553.

From the foregoing, we conclude that the propriety of convictions in cases like this, under section 1341, does not turn upon a mechanical determination of when the mailings occurred; rather, determination depends upon a careful examination of the evidence in each case to determine the contribution made by mailings to the scheme's success. Conviction under the section is apparently sustainable if it is supported by adequate proof that the offender intended that use of the mails, even if delayed, would promote the fraud's success and if the fraudulent scheme is of sufficient magnitude in its effect, is continuing in nature, and contemplates the use of the mails as one of its integral parts.

Here, for nearly a year, the defendants engaged in an ongoing scheme of magnitude, the object of which could not have been accomplished without the delay occasioned by ordinary mailing procedures which the schemers contemplated and which, by careful planning, they undertook to insure would be followed. We conclude, therefore, in the circumstances of this case, that the mails were indeed employed to accomplish the fraud and that section 1341 was violated. *See* Kloian v. United States, 349 F.2d 291 (5th Cir.), cert. denied, 384 U.S. 913, 86 S.Ct. 1349, 16 L.Ed.2d 365 (1965); Adams v. United States, 312 F.2d 137 (5th Cir. 1963). *Compare* Stevens v. United States, 227 F.2d 5 (8th Cir. 1955); Deschenes v. United States, 224 F.2d 688 (10th Cir. 1955).

We hope we have made it clear that the decision to which we are driven by the facts in this case cannot, under *Parr*, be construed as establishing the general proposition that perpetrators of all credit card frauds are amenable to federal prosecution under section 1341. Indeed, absent further Congressional action which might require a different outlook, we think it would be wise for federal authorities, in credit card fraud cases, to defer to the application of the criminal law processes of the states.

Affirmed.