**UNITED STATES of America, Appellee,**

v.

**Oscar CHASON, Defendant-Appellant.**

**No. 4, Docket 71–1414.**

United States Court of Appeals, Second Circuit.

Argued Sept. 13, 1971.

Decided Nov. 12, 1971.

---

Walter M. Phillips, Jr., Asst. U. S. Atty., Southern District of New York (Whitney North Seymour, Jr., U. S. Atty., and Jay S. Horowitz, Asst. U. S. Atty., Southern District of New York, on the brief), for appellee.

Andrew T. McEvoy, Jr., New York City (Schulman, Abarbanel, Perkel & McEvoy, Thomas R. Newman, and Benjamin H. Siff, New York City, on the brief), for appellant.

Before KAUFMAN, ANDERSON and FEINBERG, Circuit Judges.

ANDERSON, Circuit Judge:

Oscar Chason, a Manhattan furrier, was charged with playing a key role in a scheme to defraud two major credit card companies, Diners Club and American Express, and was convicted on ten counts of mail fraud, 18 U.S.C. § 1341. The scheme itself was rather simple. Certain persons would purchase airline tickets with lost or stolen credit cards and then pass these tickets on to Chason who either used them himself or resold them for 50 to 60 per cent of their actual value.

The appellant's first claim on appeal is that, even if he was guilty of fraud, neither the indictment nor the evidence showed that he used the mails in the execution of the scheme to the extent necessary for a violation of the federal mail fraud statute. He relies heavily upon Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), and Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944), for the proposition that his conduct is not proscribed by § 1341.[1]

---

1. The defendant also stresses the fact that he did not personally use the credit cards which set in motion the various mailings which formed the basis for the charges.

While it is certainly true, as these cases point out, that not every tangential use of the mails in essentially local fraud cases make them into federal issues, we are satisfied that this case is within the scope of § 1341.

The testimony at trial established that whenever a credit card was used to purchase an airline ticket, several mailings took place. First the airline mailed an invoice with the amount due to the credit card company, which would in turn mail a check to the airline and also bill the owner of the card by mail. In the course of a normal legitimate transaction the card owner would then mail his check to the company. Of course, in the instances involved here, the card owners refused to pay because they had not personally used or authorized the use of their cards to buy the tickets. The testimony also revealed that in most instances the credit card company, rather than the airlines or the card owners, bore the loss from an illicit use of the cards.

The ten counts upon which the appellant was convicted were all based upon either the invoice mailings from the airlines to the credit card companies or the check mailings from the companies to the airlines. The appellant claims that these mailings had no part in the fraud scheme itself. He argues that once the tickets were procured by the improper use of the credit cards, the perpetrators of the fraud had no further interest in what happened. The mailings, for them, were simply after the fact.

█ Whether or not this view could have been maintained on the basis of *Parr, supra,* and *Kann, supra,* the Court in United States v. Sampson, 371 U.S. 75, 80, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962), made it quite plain that there is no *per se* rule that a mailing *after* a defrauder has obtained his ill-gotten gain precludes an indictment and conviction

This is, however, of little moment, for there was sufficient to convict the appellant as an aider and abettor under 18

under the mail fraud statutes. The real test is the extent of the contribution which the mails make to the success of the entire scheme, *see* United States v. Kelem, 416 F.2d 346, 350 (9 Cir. 1969), cert. denied, 397 U.S. 952, 90 S.Ct. 977, 25 L.Ed.2d 134 (1970). Under this test, the activity under question here clearly comes within the limits of § 1341.

First, the success of this scheme depended upon the use of credit cards which, in turn, depended on the mails for their operation and use. Therefore, without the use of the mails there could have been no fraud in this case. This was the reasoning which lay behind the recent decision in United States v. Kellerman, 431 F.2d 319 (2 Cir.), cert. denied, 400 U.S. 957, 91 S.Ct. 356, 27 L. Ed.2d 266 (1970), holding that a scheme to make and sell counterfeit credit cards was a violation of § 1341 because the ultimate use of the bogus cards contemplated the use of the mails. This was also the rationale of the Fifth Circuit in holding that the fraudulent use of credit cards was a violation of § 1341 because the use of the mails was "an incident to a material part of the scheme, *viz.,* the extension of credit," Adams v. United States, 312 F.2d 137, 140 (5 Cir. 1963); Kloian v. United States, 349 F.2d 291, 293–294 (5 Cir. 1965), cert. denied, 384 U.S. 913, 86 S.Ct. 1349, 16 L.Ed.2d 365 (1966).

A second important contribution which the mails made to the success of the fraudulent scheme here under consideration, sufficient to bring it within § 1341, was the inherent time delay. Because the invoices had to be mailed to the credit card companies and the companies had to mail bills to the card owners before the fraud was even discovered, the time consumed helped the appellant maintain his practices longer than might otherwise have been possible and gave the ultimate holders of the tickets time to make use of them before the airlines had discovered that the tick-

U.S.C. § 2, on which the court explicitly and correctly charged the jury.

ets were worthless and had cancelled them. It was on a very similar set of facts in *Kelem, supra,* that the Ninth Circuit, in an opinion by Judge Ely, held the scheme to be a violation of § 1341. In that case airline tickets were purchased with credit cards by various persons who never intended to pay for them, and who then sold them to the defendant Kelem for 65% of face value. Kelem then resold them for 85% of face value. It was held that the delay in discovering the scheme, caused by the use of the mails, was sufficient for a violation of § 1341. It should also be noted that the Court in *Sampson, supra,* found the necessary use of the mails in a fraud scheme where letters were sent simply to lull fraud victims into thinking that they had not been defrauded. The delay in finding out about the fraud, caused by these letters, was sufficient to create a § 1341 violation, *see also* United States v. Eskow, 422 F.2d 1060 (2 Cir.), cert. denied, 398 U.S. 959, 90 S.Ct. 2174, 26 L.Ed.2d 544 (1970).

Finally, a third use of the mails in this case which violated § 1341 derived from the fact that it was not the airlines, but the credit card companies, who were actually defrauded. The use of the mails in sending the invoices to the companies and in receiving the checks sent by them was clearly an essential step in this fraud, *see Adams, supra,* 312 F.2d at 140.

As a final point, it should be noted that our construction of § 1341 in no way violates the theory behind this federal statute that local fraud cases should be prosecuted by state authorities. This fraud scheme allegedly involved numerous persons in many states. Just the mailings charged in the indictment went between the States of Florida, Georgia, New York and Massachusetts. Local law enforcement officials would be hard put to cope with such fraudulent practices on their own and the use of federal criminal law is proper and appropriate.

■ The second of the appellant's claims is that the trial court committed error in excluding certain evidence which he offered. Chason's trial defense relied primarily on the issue of intent. He never denied having, using, or selling the airline tickets, but he did claim that his possession of them was in good faith.

He testified at trial that he purchased most of the tickets from Ken DeWald, although he also received some of them in partial payment for a coat from Elmer Dudley. Chason claimed that DeWald told him that the tickets came from two sources. One was from salesmen who had credit cards and needed ready cash: they would buy the tickets on credit and then sell them to DeWald at less than half-price. The salesmen would then have the use of the money until their credit card bills became due. The other source was from advertising agencies which received tickets as payment from the airlines for advertising time. In both cases, DeWald had the connections to get the tickets from the salesmen and the radio and television personnel.

Chason further testified that he either used the tickets himself or sold them at his cost (50% of face value) to friends and customers as a favor, that he made no money on any of the resales, and that until just before he was arrested, he never knew that there was anything wrong with the tickets.

At the trial, to prove that he had no fraudulent intent he offered the testimony of one Gordon who took the witness stand and said that he was in the fur manufacturing business, that he had known the appellant for some twelve years, and that one day he was in Chason's place of business where he overheard a certain conversation between Chason and DeWald. The Government objected to Gordon's testifying to the substance of this conversation on the ground of hearsay. The court sustained the objection. The defendant then made an offer of proof to the effect that Gordon would testify that he heard DeWald tell Chason how DeWald was able to get airline tickets very cheaply, and that

DeWald told Chason that the sources of the tickets were the same, in substance, as that described in Chason's own testimony.

The defendant argued then, as he does now on appeal, that this testimony was admissible under the state of mind exception to the hearsay rule.

We have no doubt that the testimony should have been received for the limited purpose for which it was offered. Gordon's testimony concerning what DeWald said to Chason was not offered to show where DeWald actually got the tickets but to show where Chason thought he got them. As testimony going to the issue of good faith, it was admissible, see United States v. Press, 336 F.2d 1003, 1010–1012 (2 Cir. 1964), cert. denied, 379 U.S. 965, 85 S.Ct. 658, 13 L.Ed.2d 559 (1965); VI J. Wigmore, Evidence, § 1789, at 235 (3rd ed. 1940); C. McCormick, Evidence, § 225, at 460–461 (1954).

There remains to be decided whether or not this error requires a new trial. A careful study of the trial transcript shows that it does not.

Rule 52(a), F.R.Crim.P., provides that any error "which does not affect substantial rights shall be disregarded." The Court in Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed. 2d 705 (1967), stated that error is harmless if the court is "able to declare a belief that it was harmless beyond a reasonable doubt."[2]

By necessity, therefore, we are called upon to look closely at what possible harm could arise from the exclusion of evidence and to look at the entire record to ascertain what effect this error might have had on the verdict. Of course, we do not know the thoughts of the jurors who sat, so we must base our judgment on the probable impact of the omitted testimony on the minds of the average jury, see Harrington v. California, 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). Merely having sufficient evidence to convict does not make error harmless, but overwhelming evidence pointing towards guilt and the lack of a strong defense are factors to be considered in making the determination, see United States v. Nasta, 398 F. 2d 283, 285 (2 Cir. 1968); see also United States ex rel. Satz v. Mancusi, 414 F.2d 90, 92 (2 Cir. 1969); United States v. Tucker, 415 F.2d 867, 870 (2 Cir. 1969), cert. denied, 397 U.S. 955, 90 S.Ct. 986, 25 L.Ed.2d 139 (1970).

There must first be considered the greatest possible value that the omitted testimony could have had for the defendant. Here even though the evidence did go to the crucial issue of good faith, it could really establish no more than a very narrow point. At best, Gordon's testimony would show that Chason, on one occasion out of the several times they met, heard DeWald give a certain explanation for the source of the airline tickets. Therefore, even assuming that the jury had heard and fully believed Gordon's testimony, we are convinced beyond a reasonable doubt that their verdict would not have changed.

For one thing, it is quite possible on the basis of Chason's own testimony, that the jury already believed that he had heard this story from DeWald but the jury then chose to give it little weight in light of the other evidence.

At the very best, Chason's story was one to stretch the credulity of the jury. Here was a successful businessman claiming that he found nothing unusual in salesmen buying airline tickets on credit and then selling them at half price so that they could have quick cash.

2. Because we are convinced that the error here was harmless, even under the *Chapman* test, we are not called upon to decide whether or not a lower standard could be applied to Rule 52(a) error, see Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Although the Ninth Circuit has clearly said that a lower standard can be applied to nonconstitutional error, Issac v. United States, 431 F.2d 11, 15 (9 Cir. 1970), our court has on occasion intimated that the *Chapman* test is to be used as the Rule 52(a) test as well, see, e. g., United States v. Semensohn, 421 F.2d 1206, 1208 (2 Cir. 1970).

Yet, even if the bill did not become due for six months this would be an interest rate of some 200%. No more believable was Chason's reliance on the story that he could get the tickets cheaply because the airlines paid for radio and television advertising with them. Furthermore, this was not just a quick resale of several tickets, for by his own admission, Chason sold over a hundred tickets to just one person. In addition, each of the tickets carried on its face an imprint of a credit card belonging to some third party. Another piece of evidence which discredited Chason's testimony that he had no idea that the tickets were "tainted" was his own admission that prior to the time that he was buying tickets from DeWald, he had once bought some tickets from a friend which turned out to be void because they had been purchased on an expired credit card. Though he had been told this by an agent of Eastern Airlines, Chason used them just the same.

Chason also testified that DeWald, his chief supplier of tickets, was "an operator that has connections where he makes a living that way." Chason did not know the occupation of Dudley, the other source of the tickets, but Chason did say that he knew that Gil Beckley, the man who introduced both DeWald and Dudley to Chason, was a bookmaker.

There were also inconsistencies between Chason's own testimony and that of other witnesses that could well have persuaded the jury to discount anything which Chason said. For example, Chason testified that DeWald always personally brought the tickets to him at his place of business. Jerome Zwerdling testified that Chason received at least some tickets from DeWald in the mail.[3]

Finally, there was testimony by two Diner's Club security officers, present when Chason was arrested, that he offered each of them a bribe if they would "help him out." Although Chason disputed this testimony, the jury may well have felt that an attempted bribe at that point manifested Chason's guilty knowledge.

Therefore, in light of the strong evidence that Chason knowingly took part in this scheme to defraud and in light of the fact that the excluded testimony by Gordon would have been of slight help to him, we conclude that the error was harmless beyond a reasonable doubt.

We have considered each of the remaining points but they do not have sufficient merit to call for comment.

Affirmed.

---

3. This mailing was not one of those charged in the indictment.