**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John E. KELLY, Defendant-Appellant.**

**No. 18847.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1972.

Decided Oct. 18, 1972.

Rehearing Denied Nov. 27, 1972.

Edward J. Calihan, Jr., Chicago, Ill., for defendant-appellant.

James R. Thompson, U. S. Atty., Gordon B. Nash, Jr., John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and KILEY and STEVENS, Circuit Judges.

KILEY, Circuit Judge.

Defendant Kelly was convicted by a jury under six counts [1] of an indictment charging use of the mails to defraud [2]

---

1. The indictment was in nine counts. Three were dismissed at the trial upon the government's motion.

2. 18 U.S.C. § 1341, Frauds and Swindles. Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository

by unauthorized use of a credit card belonging to another. We affirm.

Mr. J. A. Frisz, marketing manager for White Motor Company, lost his Universal Air Travel Plan credit card on October 11, 1968. The card had been issued by United Airlines to the White Motor Company, for use by Frisz only. On November 19, 1968, Kelly, a Utah attorney, was arrested in Houston, Texas, after attempting to purchase with the Frisz card two identical tickets from Sabena Belgian World Airlines. The arrest occurred after airline officials became suspicious of Kelly, since the card was limited to Frisz only. The airline officials challenged Kelly's identity. Kelly ran off, but was pursued by the officials, who apprehended him a block away. His indictment, trial and conviction followed.

The indictment charged a scheme to defraud as follows: Kelly used the Frisz card without authority, and by false representations obtained airline tickets. He effectually made false promises to the airlines that they would receive payment for the tickets bought by him with the credit card.

The federal element of use of the mails was alleged in the following manner: Kelly, as part of the scheme, "knowingly caused to be delivered by mail . . . envelope[s] containing . . . transportation receipt[s] addressed to United Airlines. . . ." The indictment charged, so far as relevant, a series of violations of § 1341 in 1968 with different airlines deceived by the fraud: November 22, TWA; November 25, National Airlines; November 25, Continental Airlines; November 29, TWA; December 4, Braniff Airlines; and December 5, American Airlines.[3]

I.

■ We see no merit in Kelly's claim that the district court abused its admitted discretion in refusing to grant his motion to transfer [F.R.Crim.P. 21(b)] the case to a more convenient forum in Nevada.

In his motion attorney Kelly claimed hardship in his lack of financial resources to transport witnesses to Illinois, and in deprivation of "free services" of a Nevada attorney. However, the motion did not identify witnesses that Kelly would call but for the transportation costs.[4] See Lindberg v. United States, 363 F.2d 438, 439 (9th Cir. 1966). And at the trial, two of Kelly's witnesses came from California to testify for him. Moreover, it is not shown that the "free services" of the Nevada attorney would have been an improvement over Kelly's pro se performance. Furthermore, since the principal victim of the fraud, United Airlines, received the receipts at its office in the Northern District of Illinois, and since the receipts were mailed from several states, the Northern District of Illinois was an appropriate forum. See United States v. Doran, 299 F.2d 511, 514 (7th Cir. 1962), cert. den. 370 U.S. 925, 82 S.Ct. 1563, 8 L.Ed.2d 504.

II.

At the beginning of trial, Kelly informed the judge that he was "not a trial lawyer, and particularly . . . not sufficiently competent to—or sufficiently informed in federal criminal practice to warrant defending [him-

---

for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, . . . or knowingly causes to be delivered by mail according to the direction thereon, . . . any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

3. The dates listed are those—as charged in the indictment—on which Kelly caused to be delivered the transportation receipts from the various airlines to the accounting office of United Airlines.

4. We note also that had Kelly identified the witnesses and made the requisite showing of inability to pay their fees, they could have been subpoenaed and brought to trial, under F.R.Crim.P. 17(b), with expenses paid by the government.

self]." During, and again at the end of, the government's presentation of its case, Kelly requested the services of the Federal Defender Program on the grounds, inter alia, that he had been unable to hire an attorney, and because he intended to take the stand in his own defense, he would have difficulty asking himself questions.

The judge then conducted a hearing into Kelly's financial affairs. The judge concluded the hearing and referred Kelly, with the aid of the district attorney, to a Federal Defender attorney Nellis, for the purpose of discussing an arrangement—determining whether Kelly qualified partially or fully under the Federal Defender Program. He directed the clerk of the court to call Nellis. The judge was to confer with Kelly and the district attorney the next morning and make the decision then whether he would appoint counsel. The judge denied Kelly's motion.

The next morning the district attorney, Nellis of the Defender Program, and Kelly conferred[5] with the judge. The district attorney opposed Kelly's motion for appointment of an attorney on the ground that Kelly "from the start" was manipulating an asserted right to counsel to create an issue for appeal, and was sufficiently capable and alert to conduct his defense pro se. Kelly repeated his financial inability to obtain private counsel. The court agreed with the view of the district attorney, and declined to impose on attorney Nellis by appointing him at the late stage of the case at which Kelly first moved[6] for the appointment.

At the previous day's hearing into Kelly's financial resources, Kelly testified that he owned 10,000 investment shares of Pig'n Whistle, Inc., a California corporation for which he had performed legal work. He said that free trading stock of the corporation was quoted at prices $2.00–2.50 per share. However, Kelly testified that under SEC rules he could not liquidate his shares since he had received them on "inside information" and for an "indeterminate time." Kelly further testified that he had offered the stock to "dozens of people" who had refused to accept. He said that his lawyers in Dallas and in Houston had refused to accept the stock, as well as the lawyer representing him in the appeal before us. However, we are not persuaded that he complied sufficiently with the judge's previous day's direction to try and obtain a Chicago attorney, other than the one who had refused to accept the stock as fee.

Kelly also testified: He owned no real or personal property—apart from the Pig'n Whistle stock and a $50 checking account balance. He had no insurance of any kind. He had not privately practiced law since 1968 and had no salary since February 1968. He had been divorced from his wife in 1968 and had not been paying the $50 per month required of him for the support of each of his two children. At the time of trial he had been living on borrowed money for over a year and a half. He owed $11,000 to one brother, $500 to another, and the cost of his airline ticket which had been lent to him by a client friend for the purpose of getting to the trial. Kelly testified that in the last two years

5. At arraignment September 17, 1969, Kelly told the court in asking for continuance: "I could arrange for private funds with which to employ an attorney. I'm from out of state." He told the judge he had no funds "at the present time" but was "attempting to arrange for some." He said he expected to arrange for "local counsel," and had spoken with one. He agreed to proceed pro se in arraignment.

6. The original record showed insufficient "findings of fact" to support the district court's ruling that Kelly was not a person "financially unable" so as to qualify for appointment of counsel under the Criminal Justice Act, 18 U.S.C. § 3006A(b) and (c). On July 17, 1972 we ordered the district court to make the requisite findings and have them certified to us. There has been certified to us the transcript of the arraignment September 17, 1969, and of the colloquy June 24, 1970 between the court, district attorney, Kelly, and Nellis, and the findings.

he had paid out between $2,000 and $3,000 in attorney fees.[7]

The judge found Kelly "more sophisticated than he pretended" and that he was not credible. The finding rested upon the court's recital of Kelly's conduct in claiming "surprise," when he appeared the day set for trial, that the case was to be tried, despite having received notice that the trial was to begin that day. The finding also rested upon Kelly's vagueness about his ability to retain counsel. This credibility finding was the function of the district judge who had ample opportunity to observe Kelly.

■ Kelly's testimony—under examination by the district attorney in the inquiry—as to his financial resources could have been suspect by the judge. Taking the testimony at face value, the judge perhaps could not justify an inference that Kelly was able to pay attorney's fees. But the judge found that he could not "accept at face value" Kelly's testimony as to his "sudden indigency" because of Kelly's earlier misstatements and misrepresentations. We cannot say the judge was required to accept Kelly's testimony at "face value." The court concluded in its findings that Kelly's motion for appointed counsel was not made in good faith but was made for the purpose of delaying the administration of justice and in the expectation of creating a spurious issue on appeal. We cannot say those findings are clearly erroneous.

■ The fact that Kelly had "access" to funds was not determinative of his financial ability. Kelly's "indigency" was not the test of his qualification for appointed counsel. The test was his "financial inability." The Criminal Justice Act of 1964 [18 U.S.C. § 3006A(b) and (c)] provides that "at every stage of the proceedings" the court shall appoint counsel for a defendant if it is satisfied after "appropriate inquiry" that the defendant is "financially unable" to obtain counsel. See also F.R.Crim.P. 44(a). Nevertheless, we conclude in view of the judge's credibility finding there is substantial evidence to support the judge's inference that Kelly was not "financially unable" to obtain an attorney. Reliance by Kelly on Wood v. United States, 387 F.2d 353 (5th Cir. 1967), is misplaced. There the court decided only—upon remand from the Supreme Court, 389 U.S. 20, 88 S.Ct. 3, 19 L.Ed.2d 20 (1967)—that the trial court should have conducted a full inquiry into the financial ability of the defendant to make full or partial payment to retain counsel.

■ We are unimpressed with the argument that Kelly was prejudiced by denial of counsel and that he was denied a fair trial. And we are not persuaded by the several instances relied upon to show Kelly's incompetence to represent himself in the trial.[8] First, we think that the record fairly shows that the district court was liberal in not applying strict procedural rules. Secondly, the transcript shows Kelly pro se was at ease in his performance. Finally, despite argument to the contrary, his performance —while not perhaps as skillful as that of the seasoned experts in the area of criminal defense—was nevertheless creditable

---

7. This was in connection with state charges concerning the fraudulent scheme.

8. One instance relied upon by Kelly is his failure to make a motion to suppress certain travel tickets as fruits of an unreasonable search. However, Kelly admits that he was receiving out-of-court advice from the attorney now representing him on appeal. Furthermore, Kelly knew that a similar motion was pending in his Houston trial, and while moving for the continuance Kelly told the judge that a motion to suppress would be appropriate in this case. Kelly had filed numerous other pre-trial motions but fails to give us a convincing reason why he did not file the motion to suppress. He admits that the credit card was lawfully seized at the time of his arrest and does not deny that the account number of the card was the basis for tracing the transportation receipts which were admitted into evidence against him.

in the face of the overwhelming proof against him. He was more knowledgeable than he pretended, participated in all aspects of the trial, and apparently had some expert guidance from out-of-court sources. The district court noted favorably more than once on Kelly's pro se performance.[9] We decide that Kelly was not denied a fair trial.

### III.

Kelly at the close of the evidence June 22 requested the names and addresses of any witnesses who could testify as to when the deceived airlines, subsequent to the date of his arrest, were sent the receipts subject of the indictment. The district attorney denied having information in possession of the government. Testimony was subsequently adduced—on Kelly's cross-examination of a witness—which shows that the receipts were mailed when the airlines knew of Kelly's arrest. And his brief states, with no dispute by the government, that receipts were received by the airlines named in the six pertinent counts, between November 22 and December 5, 1968—after his arrest. We see no merit, however, in the claim that the government was guilty of knowingly withholding evidence from him so as to invoke the rule in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

### IV.

Kelly claims that the subsequent mailing of the transportation receipts from the various airlines to United Airlines was merely incidental and collateral to, and therefore not in furtherance of, the scheme to defraud. He argues that the scheme was completed when he obtained the airline tickets, and relies upon Kann v. United States, 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944); Parr v. United States, 363 U.S. 370, 80 S.Ct. 1171, 4 L.Ed.2d 1277 (1960), and this court's decisions in United States v. Riedel, 126 F.2d 81 (7th Cir. 1942); and United States v. Gardner, 171 F.2d 753 (7th Cir. 1948).

We are aware that the government must prove the essential allegation that part of Kelly's fraudulent scheme was to cause the deceived airlines to mail transportation receipts to their accounting offices and to cause those offices to mail the receipts to United Airlines for collection. Absent that proof there is no federal offense. Kann 323 U.S. at 95, 65 S.Ct. 148; Parr 363 U.S. at 385, 65 S.Ct. 148. Furthermore, there must be proof that the use of the mails was included within, and in furtherance of, the scheme to defraud.

In Kann and Parr the Supreme Court was unable to find that the mailings were an integral part of the fraudulent scheme. However, neither Kann nor Parr announced an inflexible rule that the use of the mails after the victim's money had been obtained could never be for the purpose of executing the fraud. United States v. Sampson, 371 U.S. 75, 80, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962); United States v. Chason, 451 F.2d 301, 303 (2nd Cir. 1971), cert. den. 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479; United States v. Strauss, 452 F.2d 375, 380 (7th Cir. 1971), cert. den. 405 U.S. 989, 92 S.Ct. 1252, 31 L.Ed.2d 455.

---

9. The district judge found that Kelly's performance pro se, with aid of counsel from a noted defense attorney not of record, was knowledgeable, professional and adequate. The court noted that various motions presented by Kelly "demonstrated" competence as an attorney. This view indicates that the court saw no prejudice to Kelly from lack of an attorney retained or appointed. We need not decide whether this view was without a basis. We note merely Kelly's ready acceptance of the pro se role at arraignment, his response to a question of the judge that he had received a copy of the indictment and waived the reading of it, his cross-examination of witnesses and his participation in the conference on instructions and argument to the jury.

In Pereira v. United States, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1953), defendant's convictions under 18 U.S.C. § 1341 were affirmed. There a woman was defrauded into giving a check to one of the defendants who endorsed it for collection. The check cleared and the bank paid Pereira. The court found no merit in the contention that the defendants had not caused the mailing.

> Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used. 347 U.S. at 8–9, 74 S.Ct. at 363.

The indictment here charged that Kelly "knowingly caused" the mailing of the transportation receipts. We think that *Pereira* supports our decision to affirm.

Kelly must be said to have anticipated that his fraudulent scheme necessarily involved the mailing by the airlines defrauded into extending credit to United, the ultimate victim, which had to reimburse those previously defrauded. *Pereira, supra.*

We also find support in Adams' v. United States, 312 F.2d 137 (5th Cir. 1963), where Adams' scheme was similar to Kelly's. Adams was charged with fraudulent use of a Gulf gasoline credit card under which scheme he "knowingly caused" use of the mails. On appeal he relied on *Kann* and *Parr*, claiming that the subsequent mailing of bills by Gulf Oil was not in execution of the scheme. The Fifth Circuit distinguished *Kann* and *Parr* on authority of *Sampson*. The court held that Adams' scheme (fraudulent purchases with the credit card) was a unitary one and that the "numerous mailings occurred *before the scheme, taken as a whole, was consummated.*"

(Emphasis added.) The court found that Gulf's extension of credit, on the faith of the card, was "inseparably connected" with the use of the mails:

> The fraudulent scheme was possible only because Gulf distributors extended credit, but extension of credit presupposed that the distributors would use the mails to forward the slips to Gulf for ultimate presentation to the card-holders. Appellant's scheme reasonably contemplated the utilization of a commercial practice which, taken in its entirety, embraced the use of the mails; and, at the very least, therefore, the use of the mails to forward the sales slips was an incident to a material part of the scheme, viz., the extension of credit. 312 F.2d at 140.

The court also found that the use of the mails to forward the sales slips occasioned a delay in the detection of the scheme, and that the delay permitted the defendant to expand the scope of his operations. 312 F.2d at 140.

Recent cases have expanded on the notion that credit card schemes to defraud involve "use of the mails" in execution of the scheme. In United States v. Kellerman, 431 F.2d 319 (2nd Cir. 1970), the court held that a scheme to make and sell counterfeit credit cards was a violation of § 1341 because the *ultimate* use of the bogus cards contemplated the use of the mails (*i. e.,* through the billing process). And in United States v. Chason, *supra,* the court decided that a scheme to sell airline tickets which had been purchased with lost or stolen credit cards was within the purview of § 1341 because use of the mails was an "essential step" in the fraud. See also United States v. Kelem, 416 F.2d 346, 350 (9th Cir. 1969), cert. den. 397 U.S. 952, 90 S. Ct. 977, 25 L.Ed.2d 134.

We hold there is ample evidence that use of the mails [10] was an integral part

10. Our construction of § 1341 in no way violates the theory of this federal statute that local fraud cases should be prosecuted by state authorities. Kelly's fraud scheme involved numerous states, in which local law enforcement officials would be hard put to cope with such fraudulent practices on their own. Use of federal criminal law is accordingly proper and appropriate. *Chason* 451 F.2d at 304.

of Kelly's fraudulent credit card scheme.[11] *Adams, Chason, Kellerman, Pereira, supra.* The success of the scheme from its inception contemplated use of the mails.

The judgment is affirmed.

11. Kelly also argues that the scheme to defraud was completed upon his arrest and that accordingly the subsequent mailings of the transportation receipts were not within the scheme. In view of our holding that the mailings were an integral part of the scheme from its inception, we see no merit in this argument.