**UNITED STATES of America**

v.

**Jose MARTINEZ–TORRES, and Nancy Medina, Defendants.**

**No. SSS 82 CR. 489 (CBM).**

United States District Court,
S.D. New York.

Jan. 19, 1983.

**1276**

John S. Martin, Jr., U.S. Atty. by James R. DeVita, Asst. U.S. Atty., New York City, for U.S.

Howard L. Jacobs, New York City, for defendant Martinez-Torres.

Anthony Ferrara, New York City, for defendant Medina.

## OPINION

MOTLEY, Chief Judge.

This case is now before the court on the application of Jose Martinez-Torres (Torres) and his common law wife Nancy Medina (Medina) for appointment of counsel, at this post trial stage, under the Criminal Justice Act (CJA). 18 U.S.C. § 3006A (1970).

Both Torres and Medina were convicted by a jury of numerous violations of the federal narcotics and firearms statutes. They have not yet been sentenced. During the pretrial stages and the trial both Torres and Medina were represented by retained counsel to whom they have paid a combined fee of $42,000. Each defendant was represented by a lawyer but both lawyers were partners in the same law firm. In view of this unusual arrangement, several pretrial hearings were held in order to determine whether Medina should be represented by other counsel because of possible conflict of interest. Medina claimed that she had no money of her own to retain counsel and that her husband Torres had paid the fee of her counsel. Initially, on arraignment, Medina had been represented by court appointed counsel upon signing an affidavit of indigency. The court advised Medina at the pretrial hearings on possible conflict of interest that the court would appoint counsel again to represent her to avoid any possible conflict if she was without funds. Medina repeatedly declined such appointment and insisted on being represented by counsel from the same firm representing her husband and whom she said had been paid by her husband.

Torres now claims that the $42,000 paid to both lawyers was supplied by his family in Puerto Rico. Torres and Medina also claim that they are presently without funds to continue paying their attorneys who refuse to provide any further representation without additional payment. Defendants' retained counsel represented to the

court that additional payment of $35,000 for the three week trial is owed them by the defendants. Both defendants dispute counsel's representation, claiming that their understanding was that the $42,000 already paid was for both trial and pretrial work. The agreement as to fees between defendants and their lawyers was not in writing. It is this fee dispute which brought on the instant application.

At a hearing held on December 2, 1982, this court denied the request for appointment of counsel. It then directed present counsel to continue to represent defendants until relieved by the Court of Appeals pursuant to Rule 4(b) of the Second Circuit Rules Supplementing the Federal Rules of Appellate Procedure, notwithstanding the fee dispute. This court finds, as a result of the hearing, that Torres and Medina have failed to carry their burden of establishing that they are financially unable to retain counsel within the meaning of the Criminal Justice Act. This opinion sets forth the court's findings of fact and conclusions of law underlying its decision.

In determining whether a defendant is entitled to court appointed counsel, the relevant threshold inquiry is whether the defendant is "financially unable to obtain adequate representation." 18 U.S.C. § 3006A (1970). The courts have construed the meaning of "financially unable." In *United States v. Kelly,* 467 F.2d 262 (7th Cir.), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2738, 37 L.Ed.2d 151 (1978), the court ruled that a defendant's "indigency" is not the test of his qualification for appointed counsel. The test is whether, as a practical matter, the defendant is "financially unable" to obtain counsel. *Id.* at 266. In *United States v. Cohen,* 419 F.2d 1124 (8th Cir.1969), the court ruled that "indigency [within the meaning of the Criminal Justice Act] is not necessarily equatable with destitution. Rather, the status comprehended is a more realistic one." *Id.* at 1127. The judge need only be satisfied that the representation essential to an adequate defense is beyond the means of the defendant. *Accord: United States v. Jackson,* 578 F.2d

1162, 1163 (5th Cir.1978) (defendant was financially able to provide own experts); *United States v. Chavis,* 476 F.2d 1137, 1141 (D.C.Cir.1973) (defendant was financially unable to obtain psychiatric tests); *United States v. Tate,* 419 F.2d 131 (6th Cir.1969) (relevant inquiry is whether defendant is unable to pay for services).

Defendant, however, has the burden of establishing such indigency within the meaning of the statute. *United States v. Schmitz,* 525 F.2d 793, 794 (9th Cir.1975). In *United States v. Schultz,* 431 F.2d 907 (8th Cir.1970), the court held that

[t]hese [CJA] provisions enunciate a two-prong test: (1) The accused must satisfy the court that financial inability prevents him from obtaining the services he requests; and (2) The accused must show need for such services to present an adequate defense.

*Id.* at 908. The Second Circuit has also ruled that defendant has the burden of showing entitlement under the Act. *United States v. Durant,* 545 F.2d 823, 826 (2d Cir.1976).

At the hearing, the following facts were established:

Torres' ledger books relating to his illegal drug mill seized pursuant to a search warrant were introduced at the trial and at the hearing on the instant application. These ledgers indicate that during the first six months of 1982, Torres' drug operations grossed $1,290,000 in sales of illegal drugs. Torres has failed to provide a satisfactory account of the income from his illegal drug operations as shown by the ledgers. Torres testified in general and without elucidation that the operational expenses of the narcotics mill consumed all of the funds derived from the sale of drugs as disclosed by the ledgers. The ledgers indicate that on June 29, 1982, a mere three days before the arrest occurred, an entry of $10,000 was recorded next to the word, "Banco," the Spanish word for bank (Tr. 26–27). On June 15th, the ledger books indicate an entry of $6,000 (Tr. 28). On June 25th an entry of $10,000 was recorded (Tr. 28).

Torres claimed that although the word "banco" means bank, he used that term to refer to the wall safe of his apartment located at 744 East 236th Street (Tr. 27). The evidence at trial disclosed that Medina was the ledgers scrivener. At the hearing on the instant application, she too gave no satisfactory account of the whereabouts of the income which the ledgers disclose.

Torres testified that at the time of his arrest on the morning of July 2, 1982, he had $375,000 in cash stored in a safe at an apartment located at 744 East 236th Street, Bronx, New York (Tr. 56), and approximately $50,000 in a safe at Apartment 5B located at 2526 Bronx Park East, Bronx, New York (Tr. 50). After the arrest of Torres and Medina, a search by federal agents of the apartments referred to above produced $23,000 in cash. Although Torres testified at a hearing prior to trial on his motion to suppress the $23,000 (together with drugs and ammunition seized from the apartments), it was not until the hearing of the instant application that Torres claimed for the first time that the federal agents illegally pocketed the difference between the $23,000 turned over by them after the search and the amounts claimed by Torres to have been in the apartment safes. Since there is no proof other than Torres' bald assertion raised for the first time on this application that the agents engaged in misconduct or misrepresentations with respect to the recovered funds, the court concludes that Torres invented this claim at the instant hearing to divert attention from his obligation to account for the funds shown by the ledgers.

Medina admitted (notwithstanding her affidavit of indigency) that at the time of her arraignment, she and her husband were the owners of a $100,000 certificate of deposit secured from a New York City bank (Tr. 86). Thereafter, on Medina's pretrial application for release on bail, which had been set at $100,000, the court found, after a hearing requested by the Government, that the $100,000 cash which had been used to purchase the certificate was not the winnings from a Puerto Rican lottery, as claimed by Medina, but was the fruit of illegal drug activity, as claimed by the Government, which had been laundered through the Puerto Rican lottery. The court thereupon refused to allow the certificate of deposit to be posted as bail on the ground that since the $100,000 were proceeds from the illegal drug operation, the same would be subject to forfeiture under the continuing criminal enterprise statute of which Torres has now been convicted. 21 U.S.C. § 848 (1970).

Despite Torres' insistence that he never deposited any of the illicit funds in a safety deposit box in a bank, the court notes that the Government has introduced on the trial and on the instant application hearing evidence of secret bank accounts. The Government introduced a transcript of a telephone conversation between Luigi Vizzini, the Government informant whom Torres employed as a bodyguard, and Jamie Villa, a prisoner in the Lewisberg Penitentiary and Torres' confidant, who was named as a co-conspirator in the indictment in this case. During this conversation, Villa advised Vizzini that once freed on bail, Medina should go to the bank and withdraw sufficient funds to pay all the attorneys (Tr. 64).

The court further finds that Torres' claim that his family provided the $42,000 payment for his and Medina's trial attorneys to be incredible. Torres' father is presently retired and receives social security payments. His mother is a dressmaker who works at home. His brother is a toolmaker. One sister is a nurse and the other is a schoolteacher. Torres also has a half-brother who is an insurance salesman and a half-sister who works in a beauty parlor (Tr. 42–47). Medina's family background is similar. Her father is disabled as a result of an accident at a cement plant and receives Workman's Compensation. Her mother does not work. Her brother is an automobile mechanic and her three sisters do not work (Tr. 78–79). Torres claims that despite their working class status these relatives somehow produced $42,000 on short notice to pay for his attorneys. Furthermore, under cross-examination, Torres never claimed that his family had savings or

assets of any kind and could not give any account of how his relatives obtained this substantial sum.

When asked whether he ever sent money to his family, Torres replied that just prior to his arrest he had intended to terminate his drug business and retire. In this connection, Torres testified that the same month that he was arrested, he had travelled to Santo Domingo in order to locate suitable land to purchase (Tr. 60). The court believes that this visit to Santo Domingo to purchase land and Torres' expressed intention to retire from his illegal activities just before being arrested provide a proper basis for inferring that he had accumulated substantial funds at that point to enable him to retire and to purchase land in Santo Domingo.

This court also finds that Torres had many opportunities to transfer and secrete funds both in Santo Domingo and with his relatives in Puerto Rico. The evidence at trial disclosed that several of his codefendants travelled to and from Puerto Rico to work in the drug mill located in the apartment at 2526 Bronx Park East. The testimony at Medina's bail hearing and at the hearing on this application also disclosed that Medina travelled to Puerto Rico.

The court appointed counsel to represent defendants on the instant application. Court appointed counsel claimed that the proceeds of the drug operation could not in any event be used to pay counsel since such funds were forfeitable under the continuing criminal enterprise statute of which Torres has been convicted.

The Government, it should be noted, did not attempt to seize as subject to forfeiture the $42,000 paid to Torres' trial counsel, as it did with respect to the $100,-000 certificate of deposit belonging to defendants. Retained counsel advised the court on the instant application that "someone" brought the $42,000 to their offices. In this connection counsel advised that the person bringing the money did not identify himself as is often true in major drug cases. It is therefore not at all conclusive that the $42,000 came from the proceeds of Torres'

drug mill. In fact, as noted above, the conspirators' plan was to have Medina out on bail so she could go to the bank and get money to pay the lawyers. Torres, as noted, has failed to provide a credible account of the source of the $42,000. Moreover, the Government has given no indication that it intends to seize any future sums paid to counsel. A hearing is yet to be held on exactly what funds are to be forfeited. The only conclusion reached by the court on this application is that a large sum of money, as noted above, was realized as a result of the drug mill's operations for which defendants have not yet accounted. In view of this court's conclusion that defendants have not carried their burden of proving financial inability to secure counsel to represent them in this post trial period and take an appeal if they desire to appeal, it is not necessary for this court to now decide whether the proceeds of an illegal drug operation can be used to pay counsel. However, the court holds that in a case such as the instant case, where it is proved by evidence on the trial that defendants have reaped enormous sums from illegal activity, the burden of showing financial inability to secure legal representation includes a showing, by a fair preponderance of the credible evidence, that the money already paid to counsel was not the proceeds of illegal activity which would be subject to forfeiture under a federal statute. It is necessary for the defendant to show the source of any legitimate large payment to counsel since he or she would have the burden of showing that this legitimate source has been exhausted. Financial inability includes an inquiry into whether there is available to defendant funds for his defense from other sources such as family, friends, trusts, estates, or defense funds. *See, e.g., United States v. Schmitz,* 525 F.2d 793, 794 (9th Cir.1975) (inquiry includes transfers in trusts); *Souder v. McGuire,* 516 F.2d 820, 821 (3rd Cir.1975) (inquiry includes money sent by mother of applicant); *United States v. Cohen,* 419 F.2d 1124, 1126 (8th Cir.1969) (inquiry includes real estate).

The court concludes from: 1) Medina's failure to disclose at the time of arraignment that she and her husband owned a $100,000 certificate of deposit as a result of which counsel was appointed; 2) Torres' failure to claim on the motion to suppress that funds put in the safes in his apartments had been taken by the federal agents during the search; 3) Torres' failure to give a credible explanation of the source of the $42,000 already paid to retained counsel; 4) Torres' testimony on the motion to suppress; 5) Medina's testimony on her bail application; and 6) the failure of both defendants, after having taken the witness stand, to satisfactorily explain any of their finances, that they are not credible witnesses.

As noted above, Torres had the burden of demonstrating indigency within the meaning of the statute. Rather than attempting to discharge this burden, Torres was evasive, unclear, and inconsistent in his testimony. At least one court has denied a request under § 3006A because the defendant made only conclusory protestations of poverty. *United States v. Schmitz, supra.* In *United States v. Kelly, supra,* the denial of appointed counsel by the district court which rested in part upon defendant's vagueness about his ability to retain counsel was sustained. Accordingly, the defendants' request for court appointed counsel is denied.