**UNITED STATES of America**

v.

**James BOWLING, Craig Kolhagen, and Dennis Pennington, Defendants.**

**No. 7:14–CR–98–D.**

United States District Court, E.D. North Carolina, Southern Division.

Signed May 26, 2015.

Evan Rikhye, U.S. Attorney's Office, Raleigh, NC, for United States of America.

## ORDER

JAMES C. DEVER III, Chief Judge.

On November 5, 2014, a federal grand jury in the Eastern District of North Carolina indicted James Bowling, Craig Kolhagen, and Dennis Pennington [D.E. 1]. The indictment charges all three defendants with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (count one), wire fraud and aiding and abetting in violation of 18 U.S.C. §§ 1343 and 2 (count two), and major fraud against the United States and aiding and abetting in violation of 18 U.S.C. §§ 1031(a) and 2 (count three). See Indictment [D.E. 1] 1–15. The indictment also charges Kolhagen with disclosing source selection information in violation of 41 U.S.C. § 2102(a) (count four). Id. 15–16. Finally, the indictment charges Bowling and Pennington with obtaining source selection information in violation of 41 U.S.C. § 2102(b) (count five). Id. 17.

On February 2, 2015, defendants Bowling and Pennington ("Valour defendants") moved to dismiss counts one, two, three, and five, pursuant to Federal Rule of Criminal Procedure 12(b) and the Fifth Amendment. See Valour Defs.' Mot. Dismiss [D.E. 28]. On February 13, 2015, the United States ("government") responded in opposition to the Valour defendants' motion to dismiss [D.E. 35]. On February 18, 2015, the Valour defendants replied [D.E. 37–2]. On February 19, 2015, Kolhagen moved to dismiss counts one, two, three, and four, pursuant to Federal Rule of Criminal Procedure 12(b) and the Fifth Amendment. See Kolhagen Mot. Dismiss [D.E. 47]. On March 2, 2015, the government filed a surreply to the Valour defendants' reply [D.E. 57]. On March 11, 2015,

the government responded in opposition to Kolhagen's motion to dismiss [D.E. 60]. On May 4, 2015, the court heard oral argument. As explained below, the court grants defendants' motions to dismiss and dismisses the indictment without prejudice.

## I.

Valour, LLC Leading Edge Solutions ("Valour") is an aircraft and helicopter maintenance company. Indictment ¶ 1.[1] Pennington is Valour's CEO and Bowling is Valour's president. Id. ¶¶ 3–4. Pennington and Bowling are former members of the United States Marine Corps. Id. Kolhagen is a Chief Warrant Officer with the United States Marine Corps and, during all relevant times, served as the Contracting Officer's Representative ("COR") for the HMX–1 squadron (the squadron "responsible for providing helicopter transport for the President and Vice President of the United States"). Id. ¶¶ 2, 5. Bowling and Kolhagen worked together as helicopter mechanics in the HMX–1 squadron from 1998 to 2001. Id. ¶ 6.

In July 2010, the chief mechanic of the HMX–1 squadron asked the Department of the Navy to award a sole-source contract for maintenance of the HMX–1 squadron helicopters to Valour. Id. ¶ 14. Valour was the sole bidder and won the three-year contract, which was valued at $3.28 million. Id. ¶¶ 14–15.

In July 2011, the Marine Corps appointed Kolhagen the COR for the HMX–1 squadron. Id. ¶ 12. In this capacity, Kolhagen oversaw the performance of contracts related to aviation maintenance for the squadron and provided assistance with

---

1. In analyzing defendants' motions to dismiss, the court assumes the allegations in the indictment are true. See United States v. Sampson, 371 U.S. 75, 78–79, 83 S.Ct. 173, 9 L.Ed.2d 136 (1962) ("Of course, none of these charges have been established by evidence, but at this stage of the proceedings the indictment must be tested by its sufficiency to charge an offense.").

acquisition planning and the contracting process. *Id.* Soon after becoming COR, Kolhagen, working with Bowling, asked the Navy to increase the annual contract value to Valour by over $300,000. *Id.* ¶ 16. The Navy agreed to modify the contract. *Id.*

In spring 2013, Kolhagen learned that the contracting authority for the HMX–1 squadron had been transferred to the Marine Corps Installations East Contracting Department ("MCI–East") at Camp Lejeune in North Carolina and that the next maintenance contract would be competitively awarded. *Id.* ¶¶ 17–18. Kolhagen disclosed this nonpublic information to Bowling. *Id.* ¶ 18. On April 29, 2013, Bowling, the incumbent contractor's president, sent Kolhagen an email in which he told Kolhagen how to draft the statement of work and the technical requirements for the next contract. *Id.* ¶ 19. Kolhagen did not disclose to officials at MCI–East that Bowling provided suggestions concerning the drafting process for the next contract. *See id.* ¶¶ 19, 26. Kolhagen also requested that the bidding be limited to designated Service Disabled Veteran Owned Small Businesses, of which Valour was one. *Id.* ¶ 20.

On October 8, 2013, an MCI–East official internally distributed an Independent Government Cost Estimate ("IGCE"). *Id.* ¶ 21. The IGCE indicated an estimated annual cost of approximately $840,000 for the next three-year maintenance contract for the HMX–1 squadron. *Id.*

On October 9, 2013, Kolhagen emailed the IGCE to Bowling and Pennington. *Id.* ¶ 22. On October 11, 2013, Pennington and Bowling replied to Kolhagen and gave him data suggesting the need to increase the annual labor costs in the IGCE by approximately $560,000. *Id.* ¶ 23. Kolhagen suggested to officials at MCI–East to raise the IGCE from $840,000 annually to $1.4 million annually. *Id.* ¶ 24. Kolhagen

did not disclose to his superiors or to officials at MCI–East that he had disclosed the IGCE to Bowling or Pennington. *See id.* ¶ 25. Officials at MCI–East agreed to increase the IGCE to approximately $1,196 million annually. *Id.* ¶ 27.

On November 6, 2013, MCI–East publicly issued its solicitation for the new contract. *Id.* ¶ 28. Six aviation maintenance companies, including Valour, submitted bids. *Id.* ¶ 29. On December 5, 2013, Valour submitted a bid with an annual price of $1,142 million. *Id.* ¶ 32.

After receiving the bids, the Marine Corps convened a source selection board at Camp Lejeune. *Id.* ¶ 33. The purpose of the source selection board was to review and grade the bids based on the bidders' responses to the technical criteria and the statement of work. *Id.* Price was a secondary consideration to technical competence. *Id.* The source selection board would then make a recommendation to the senior contracting official at MCI–East, who had the authority to award the contract. *Id.*

Kolhagen's command told him not to participate in the source selection board because of his personal relationship with Valour's officers. *Id.* ¶ 34. Nevertheless, on December 10, 2013, Kolhagen traveled to Camp Lejeune to participate in the source selection board. *Id.* ¶ 35. Such participation is normally appropriate for the COR of the Marine unit receiving service from the contract. *Id.* ¶ 34.

At the board meeting, Kolhagen rated Valour disproportionately higher than other competitive firms despite specific and serious past performance concerns. *Id.* ¶ 37. Because of Kolhagen's high rating for Valour, the chair of the source selection board discarded Kolhagen's ratings and input. *Id.* ¶ 38. The source selection board did not recommend Valour and instead recommended a different firm that

offered superior technical qualifications and a significantly lower bid price. *Id.* ¶ 39.

When Kolhagen learned of the source selection board's decision to recommend another firm, he called board members and officials at MCI–East and demanded that the contract be given to Valour. *Id.* ¶ 40. MCI–East officials refused to change their recommendation. *Id.* On December 26, 2013, Bowling emailed Kolhagen and asked him to try to convince the senior contracting official to reject the source selection board's recommendation. *Id.* ¶ 41. Bowling instructed Kolhagen how to convince the senior contracting official to reject the recommendation. *Id.* Kolhagen spoke with the senior contracting official but failed to convince the official to award Valour the contract. *Id.* ¶ 42.

## II.

■ "A motion to dismiss an indictment tests whether the indictment sufficiently charges the offense the defendant is accused of committing." *United States v. Vanderhorst,* 2 F.Supp.3d 792, 795 (D.S.C.2014); *Sampson,* 371 U.S. at 78–79, 83 S.Ct. 173. An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed.R.Crim.P. 7(c)(1). "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974); *see United States v. Williams,* 152 F.3d 294, 299 (4th Cir.1998). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself," but the statutory language "must be accompanied with such a statement of the facts … as will inform the accused of the specific offence

… with which he is charged." *Hamling,* 418 U.S. at 117–18, 94 S.Ct. 2887 (quotation omitted).

■ A district court may dismiss an indictment for nonconstitutional errors or irregularities in the grand jury proceeding where there is actual prejudice to the defendant. *See, e.g., United States v. Brewer,* 1 F.3d 1430, 1433 (4th Cir.1993). In order to demonstrate such prejudice, a defendant must show that (1) "the irregularity substantially influence[d] the decision to indict," or (2) "there is grave doubt that the decision to indict was free from the substantial influence of such irregularities." *Id.* (quotation and alteration omitted); *see Bank of Nova Scotia v. United States,* 487 U.S. 250, 256, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Such an error or irregularity may be "an infirmity of law in the prosecution." *United States v. Engle,* 676 F.3d 405, 415 (4th Cir.2012) (quotation omitted). In other words, the defendant must "demonstrate that the allegations [in the indictment], even if true, would not state an offense." *United States v. Thomas,* 367 F.3d 194, 197 (4th Cir.2004); *see also Russell v. United States,* 369 U.S. 749, 768 & n. 15, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) (stating that a purpose of the specificity requirement in the indictment "is to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction" (quotation omitted)); *United States v. Bergrin,* 650 F.3d 257, 268 (3d Cir.2011) ("[The] district court's] determination must be based on whether the facts alleged in the indictment, if accepted as entirely true, state the elements of an offense and could result in a guilty verdict."); *United States v. Brandon,* 298 F.3d 307, 310 (4th Cir. 2002) ("Thus, the indictment must also contain a statement of the *essential facts* constituting the offense charged." (quotation omitted)). "It is perfectly proper, and in fact mandated, that the district court dismiss an indictment if the indictment

fails to allege facts which constitute a prosecutable offense." *United States v. Coia,* 719 F.2d 1120, 1123 (11th Cir.1983).

### III.

### A.

■ The court first addresses defendants' arguments concerning counts four and five because the success of those arguments implicates the remaining counts. Counts four and five charge violations of 41 U.S.C. § 2102(a) and (b) of the Procurement Integrity Act against Kolhagen and the Valour defendants, respectively. *See* Indictment 15–17. Section 2102(a) prohibits certain persons from "knowingly disclos[ing] ... source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. § 2102(a)(1). Kolhagen concedes that section 2102(a) applies to him. *See* Mem. Supp. Kolhagen Mot. Dismiss [D.E. 47] 2–3. As for the Valour defendants, section 2102(b) states that "a person shall not knowingly obtain ... source selection information before the award of a Federal agency procurement contract to which the information relates." 41 U.S.C. §. 2102(b). Thus, section 2102(b) applies to the Valour defendants.

The only alleged "source selection information" at issue in counts four and five is the IGCE. Defendants argue that the IGCE, which Kolhagen disclosed to Bowling and Pennington on October 9, 2013, is not "source selection information" under the Procurement Integrity Act. *See, e.g.,* Mem. Supp. Valour Defs.' Mot. Dismiss [D.E. 28] 12–16. Accordingly, defendants assert that Kolhagen's disclosure and the Valour defendants' receipt of the IGCE does not violate section 2102 and that counts four and five fail to allege a prosecutable offense.

To determine whether the IGCE at issue in this case was "source selection information," the court first looks to the Procurement Integrity Act's statutory text. *See, e.g., Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 .S.Ct. 1146, 117 L.Ed.2d 391 (1992); *Ayes v. U.S. Dep't of Veterans Affairs,* 473 F.3d 104, 108 (4th Cir.2006); *United States v. Sheek,* 990 F.2d 150, 152 (4th Cir.1993). Section 2101(7) defines "source selection information" as "any of the following information prepared for use by a Federal agency to evaluate a bid or proposal to enter into a Federal agency procurement contract." 41 U.S.C. § 2101(7). Section 2101(7) then lists ten types of information, including "source selection plans," "technical evaluation plans," "cost or price evaluations of proposals," "rankings of bids, proposals, or competitors," and a catch-all provision for information that the government marked as "source selection information" on a "case-by-case determination by the head of the agency, the head's designee, or the contracting officer." *See* 41 U.S.C. § 2101(7)(A)-(J).[2] Section 2101(7) does not explicitly include an IGCE as "source se-

2. 41 U.S.C. § 2101(7) states:

The term "source selection information" means any of the following information prepared for use by a Federal agency to evaluate a bid or proposal to enter into a Federal agency procurement contract, if that information previously has not been made available to the public or disclosed publicly:

(A) Bid prices submitted in response to a Federal agency solicitation for sealed bids, or lists of those bid prices before public bid opening.

(B) Proposed costs or prices submitted in response to a Federal agency solicitation, or lists of those proposed costs or prices.
(C) Source selection plans.
(D) Technical evaluation plans.
(E) Technical evaluations of proposals.
(F) Cost or price evaluations of proposals.
(G) Competitive range determinations that identify proposals that have a reasonable chance of being selected for award of a contract.

lection information." However, section 2101(7) references "cost" or "costs" in two places. Section 2101(7)(B) references "[p]roposed costs or prices *submitted in response* to a Federal agency solicitation, or lists of those proposed costs or prices." 41 U.S.C. § 2101(7)(B) (emphasis added). Section 2101(7)(F) references "[c]ost or price *evaluations of proposals.*" 41 U.S.C. § 2101(7)(F)(emphasis added). The IGCE does not fall within either of these two definitions. The first definition encompasses information that a bidder submits to the government in response to the government's solicitation of bids. The second definition encompasses the government's evaluation of a bidder's proposal. Likewise, an IGCE is not a "[b]id price[ ] submitted in response to a Federal agency solicitation." 41 U.S.C. § 2101(7)(A). Furthermore, the catch-all provision in 41 U.S.C. § 2101(7)(J) does not apply in this case because the government did not mark the IGCE as "source selection information." *See* Oral Argument Tr. [D.E. 66] 11 (the government conceding that section 2101(7)(J) does not apply in this case).

The government argues that the IGCE at issue in this case falls within the definition of "source selection information" contained in section 2101(7)(C), which references "[s]ource selection plans." 41 U.S.C. § 2101(7)(C); Gov't's Resp. Valour Defs.' Mot. Dismiss [D.E. 35] 9 ("In this case, the government contends that the independent government cost estimate at issue ... falls under category C of the definition of source selection information, namely 'source selection plans.' ").[3] The government then asserts, without citation to any legal authority, that "[s]ource selection plans are prepared by the government and include the government's cost estimate." Gov't's Resp. Valour Defs.' Mot. Dismiss [D.E. 35] 9.

In analyzing counts four and five, the parties discussed the military's acquisition procedures. The Marine Corps Acquisition Procedures Supplement ("MAPS"), a supplement to the Federal Acquisition Regulations ("FAR"), states that a source selection plan "shall include, at minimum, the subject areas and evaluation criteria addressed in the Department of Defense Source Selection Procedures." MAPS 15.303–100(c) (Jan. 2015), *available at* http://farsite.hill.af.mil/archive/MAPS/2014-02/PART15.htm# P9_1465. Section 2.2 of the Department of Defense Source Selection Procedures defines what the source selection plan must include. *See* Department of Defense Source Selection Procedures § 2.2 (2011), *available at* http://www.acq.osd.mil/dpap/policy/policyvault/USA007183-10-DPAP.pdf. The required information includes "[b]ackground and [o]bjectives," an "[a]cquisition [s]trategy," and "[e]valuation [f]actors and [s]ubfactors," but does not include the IGCE or any discussion of costs. *See id.*[4] More-

---

(H) Rankings of bids, proposals, or competitors.
(I) Reports and evaluations of source selection panels, boards, or advisory councils.
(J) Other information marked as "source selection information" based on a case-by-case determination by the head of the agency, the head's designee, or the contracting officer that its disclosure would jeopardize the integrity or successful completion of the Federal agency procurement to which the information relates.

41 U.S.C. § 2101(7).

3. The government briefly suggested at oral argument—and later retracted—that an IGCE might fall under "cost or price evaluations of proposals." *See* Oral Argument Tr. 11, 18–19. The court rejects this interpretation as contrary to the plain language of 41 U.S.C. § 2101(7)(F).

4. The only time the word "cost" appears in this section of these regulations is under "Evaluation Factors and Subfactors," where it states that the source selection plan must

over, the source selection plan from the bidding process at issue in the indictment undermines the government's contention that section 2101(7)(C) includes the IGCE. *See* [D.E. 38]. Tellingly, the source selection plan, which specifies in several places that it is "source selection information" and therefore subject to section 2102's disclosure prohibitions, *see id.* 4, 6, 7, does not refer to the IGCE. The acquisition strategy, which the government belatedly argues includes the IGCE, *see* Gov't's Surreply [D.E. 57] 8–9, likewise does not refer to the IGCE but instead discusses the criteria and process for judging the bids. *See* [D.E. 38] 4.

Simply put, nothing in section 2101(7)(C)'s text supports the proposition that the IGCE at issue in this case is part of a "source selection plan" under section 2101(7)(C) or falls within the statutory text of section 2101(7). *See Sheek,* 990 F.2d at 152 ("Statutory construction must begin with the language of the statute and the court should not look beyond that language unless there is ambiguity or unless the statute as literally read would contravene the unambiguously expressed legislative intent gleaned from the statute's legislative history."). Even if there were any ambiguity concerning the definition of "source selection information," the rule of lenity compels the court to interpret section 2101(7) to not include within its scope the IGCE that Kolhagen disclosed to Bowling and Pennington. *See, e.g., United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971) ("Thus, where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant."); *United States v. Hilton,* 701 F.3d 959, 966 (4th Cir.2012) ("Criminal statutes are to be strictly construed and should not

be interpreted to extend criminal liability beyond that which Congress has plainly and unmistakenly proscribed." (quotations omitted)). Hence, the allegations in counts four and five of the indictment, which the court assumes to be true for purposes of the motion to dismiss, do not state an offense under 41 U.S.C. § 2102. Accordingly, the court must dismiss counts four and five.

In opposition to this conclusion, the government cites several sections of the FAR, four other federal criminal cases involving the Procurement Integrity Act, and two additional government manuals. *See* Gov't's Resp. Valour Defs.' Mot. Dismiss [D.E. 35] 10–18; Gov't's Surreply [D.E. 57] 1–3. As for the cited FAR sections, none of them address whether an IGCE is included in the statutory definition of "source selection information" in the Procurement Integrity Act.

As for the government's reliance on four other criminal cases involving the Procurement Integrity Act, the argument fails. In the first case, *United States v. Ellis,* No. 1:14–CR–205–AJT (E.D.Va.), the defendant pleaded guilty to a criminal information that charged him with disclosing "source selection information" in violation of section 2102. *See* Information, *United States v. Ellis,* No. 1:14–CR–205–AJT (E.D. Va. June 17, 2014), [D.E. 5]. The criminal information charged the defendant with disclosing six documents, including two IGCEs, an acquisition plan, and a draft statement of objectives. *Id.* at 3. That a criminal defendant pleaded guilty to violating section 2102 by disclosing six documents, one of which (the acquisition plan) is explicitly required in a source selection plan, lends no legal support to the

---

"[i]dentify ... the importance of all non-cost or price factors to the cost or price factor." Department of Defense Source Selection Procedures § 2.2.5. In other words, the regula-

tions suggest that the source selection plan must state the relative importance of noncost factors to cost factors.

contratextual proposition that an IGCE is source selection information under section 2101(7)(C).

In *United States v. Hughes,* No. 7:12-CR-4-0-KA-4 (N.D.Tex.), the defendant pleaded guilty to count one of the indictment, which charged a conspiracy to violate the Procurement Integrity Act. *See* Plea Agreement at 1, *United States v. Hughes,* No. 7:12-CR-4-0-KA-4 (N.D.Tex. Sept. 14, 2012), [D.E. 39]. Count one specifically alleged that the defendant obtained "specifications, quantities and government pricing estimates," "government cost and pricing information," "sensitive government pricing information," and "sensitive government estimates on job, or task orders, as well as sensitive competitor bid information." *See* Indictment at 6–9, *United States v. Hughes,* No. 7:12-cr-4-0-KA-4 (N.D.Tex. July 18, 2012), [D.E. 1]. The *Hughes* indictment did not specify that the defendant obtained an IGCE. Assuming arguendo that the defendant in *Hughes* obtained an IGCE, the same problem arises as in *Ellis:* the defendant in *Hughes* confessed to obtaining multiple types of information, including information on competitors' bids, and the possible inclusion of an IGCE does not necessarily mean that an IGCE is source selection information under section 2101(7)(C). *Cf.* 41 U.S.C. § 2101(7)(A) (defining as source selection information "[b]id prices submitted in response to a Federal agency solicitation for sealed bids").[5]

The government concedes that the last two cases it cites do not involve the disclosure of an IGCE. *See* Gov't's Resp. Valour Defs.' Mot. Dismiss [D.E. 35] 16–18. Ac-

cordingly, these cases are irrelevant to whether the IGCE in this indictment falls within section 2101(7)(C). Viewing all four cases individually and holistically, the cases do not support the proposition that an IGCE is source selection information under section 2101(7)(C).

As for the cited government manuals, the government relies on a statement in the Defense Contract Management Agency manual which states: "The IGCE is procurement sensitive information and should only be released within the Government to those who have a bona-fide need to know. Unauthorized release of procurement sensitive information is prohibited by law." Defense Contract Management Agency Instruction 140.3.10.2 (2013), *available at* http://www.dcma.mil/policy/140/DCMA–INST–140.pdf. The manual cites no law in support of this assertion. Furthermore, the manual is dated December 9, 2013, two months *after* Kolhagen allegedly emailed the IGCE to Bowling and Pennington in this case, and the government conceded at oral argument that the manual sheds no light on whether the IGCE in this case is "source selection information" under section 2101(7)(C). *See* Oral Argument Tr. 15.

The government also relies on a statement in the second appendix to the Department of Defense's COR Handbook which states: "The IGCE is a procurement-sensitive document and should be handled accordingly. Access to the IGCE is on a need-to-know basis." Department of Defense COR Handbook 129 (2012), *available at* https://acc.dau.mil/docs/cor/USA001390–12_DoD_COR_Handbook_Signedl.pdf. Notably, this manual does not

---

5. A "factual resume" in *Hughes* states that the defendant "obtained sensitive source selection information ... to include government cost and pricing information." Factual Resume at 6, *United States v. Hughes,* No. 7:12-cr-4-0-KA-4 (N.D.Tex. Sept. 14, 2012), [D.E. 38].

The court does not find this document, which was created and signed by the Assistant United States Attorney and the defendant, legally persuasive concerning whether an IGCE is source selection information under section 2101(7)(C).

call the IGCE source selection information, only a "procurement-sensitive document." *See id.* Thus, these manuals do not support the government's position that Kolhagen's disclosure of the IGCE to Bowling and Pennington violated the Procurement Integrity Act.[6]

In sum, section 2101(7) does not include the IGCE at issue in this case within the statutory definition of source selection information. Thus, as a matter of law, defendants did not violate section 2102 when Kolhagen disclosed the IGCE to Bowling and Pennington. Just as people "must turn square corners when they deal with the [g]overnment,"[7] so too must the government turn square corners when it criminally prosecutes an individual. Although defendants' actions in disclosing and receiving the IGCE in this case were (perhaps) dishonorable, unbecoming, or unethical, those actions did not constitute a crime under the Procurement Integrity Act. Furthermore, if the government contends that an IGCE is always "source selection information" it need only prospectively instruct its contract personnel to mark each IGCE as "source selection information" under section 2101(7)(J) of the Procurement Integrity Act. Accordingly, because counts four and five fail to allege a prosecutable offense, the court dismisses counts four and five.

### B.

Counts one, two, and three of the indictment charge all defendants with conspiracy to commit wire fraud, wire fraud, and major fraud against the United States, respectively. *See* Indictment 1–44. Defendants contend that two independent reasons merit dismissing these counts: (1) the indictment fails to allege facts stating these offenses; and (2) the government's erroneous legal instruction to the grand jury that the IGCE at issue in this case is "source selection information" under the Procurement Integrity Act taints counts one, two, and three of the indictment.

#### 1.

■ This court has concluded that the IGCE at issue in this case does not fall within the statutory definition of source selection information and that Kolhagen's disclosure of the IGCE to Bowling and Pennington did not violate 41 U.S.C. § 2102. Language in counts one, two, and three of the indictment suggests, however, that the grand jury considered the disclosure of the IGCE to violate the Procurement Integrity Act when it returned a true bill on counts one, two, and three. *See, e.g.,* Indictment 9–10, 21–22, 30; *cf.* Oral Argument Tr. 41–42. Moreover, at oral argument, the government acknowledged that it instructed the grand jury that the IGCE at issue in this case was "source selection information" under the Procurement Integrity Act. *See* Oral Argument Tr. 39.

After hearing oral argument and considering the record, the court concludes that the government's erroneous legal instruction to the grand jury concerning the Pro-

---

**6.** At oral argument the government also explained that its interpretation of section 2101(7)(C) relied in part on statements by one of Kolhagen's superiors, made months after the disclosure, that the IGCE was part of the contract's acquisition strategy. *See* Oral Argument Tr. 13–14, 18. The government conceded, however, that the IGCE was not marked as source selection information under 41 U.S.C. § 2101(7)(J). *Id.* 11, 13. A government official's ex post opinion that a document was source selection information is not legally binding or logically persuasive. Moreover, the court rejects the government's reliance on that ex post opinion to pursue a criminal prosecution under the Procurement Integrity Act.

**7.** *Rock Island, Ark. & La. R.R. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920).

curement Integrity Act played a significant and impermissible role in the grand jury's decision to indict defendants on counts one, two, and three. *See, e.g., id.* 22–23 (the government acknowledged at oral argument that Kolhagen's failure to tell his superiors that he disclosed the IGCE was one of three material misrepresentations on which its theory of the case relied and on which it instructed the grand jury). Accordingly, the court must dismiss the first three counts of the indictment. *See, e.g., Bank of Nova Scotia,* 487 U.S. at 256, 108 S.Ct. 2369; *see Brewer,* 1 F.3d at 1433; *United States v. Stevens,* 771 F.Supp.2d 556, 566–68 (D.Md.2011) (dismissing an indictment where the government "seriously misstate[d] the applicable law" to the grand jury). The court dismisses these counts without prejudice because the government's erroneous legal instruction to the grand jury was made in good faith. *See, e.g., Stevens,* 771 F.Supp.2d at 566–69.

### 2.

In light of this disposition, the court need not address defendants' alternative argument that the indictment fails to allege facts stating the offenses charged in counts one, two, and three. Nonetheless, because the government may pursue these charges in another indictment, the court addresses a troubling argument that the government made concerning count three, major fraud against the United States, codified at 18 U.S.C. § 1031.

Section 1031 states that "[w]hoever knowingly executes, or attempts to execute, any scheme or artifice with the intent—(1) to defraud the United States; or (2) to obtain money or property by means of false or fraudulent pretenses, representations, or promises" in connection with government procurement faces criminal penalties. 18 U.S.C. § 1031(a). The Fourth Circuit has not defined the essential elements of section 1031.

In its brief, the government contends that section 1031(a)(1), which references a scheme or artifice with the intent "to defraud the United States," does not require a false representation to be made, unlike the explicit requirement of section 1031(a)(2). *See* Gov't's Resp. Valour Defs.' Mot. Dismiss [D.E. 35] 19–20. In support of this perplexing assertion about section 1031(a)(1), the government cites *United States v. Clausen,* 792 F.2d 102 (8th Cir. 1986). In *Clausen,* the defendant appealed his conviction of wire fraud under 18 U.S.C. § 1343 and argued that the indictment was flawed because it did not allege a false statement. *Clausen,* 792 F.2d at 103–04. The Eighth Circuit noted that other courts of appeals had interpreted section 1343 to forbid "*both* schemes to defraud, whether or not any specific misrepresentations are involved, *and* schemes to obtain money or property by means of false or fraudulent pretenses, representations, or promises." *Id.* at 104. The *Clausen* court then concluded that "a scheme to defraud need not include false representations to violate the wire fraud statute." *Id.* at 105.

There are three problems with the government's legal analysis concerning section 1031(a)(1) and its reliance on *Clausen.* First, in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court rejected the similar position, taken by various courts of appeals, that the identical provision in 18 U.S.C. § 1341, the mail fraud statute, stated two independent offenses. The *McNally* Court recognized that Congress arguably intended the two phrases to be construed independently, but the Court then rejected that interpretation, stating that "adding the second phrase simply made it unmistakable that the statute reached false promises and misrepresentations as to the future as well as other frauds involving money or property."

*McNally,* 483 U.S. at 358–59, 107 S.Ct. 2875. Although Congress abrogated a separate holding in *McNally* when it enacted 18 U.S.C. § 1346 in 1988, the Supreme Court subsequently confirmed its rejection of the independent-offense interpretation of section 1341. *See Cleveland v. United States,* 531 U.S. 12, 26, 121 S.Ct. 365, 148 L.Ed.2d 221 (2000). Thus, *Clausen's* interpretation of section 1343 is untenable in light of *McNally* and *Cleveland,* as well as additional binding precedent acknowledging the requirement of a material falsehood in federal mail fraud, wire fraud, and bank fraud statutes. *See, e.g., Neder v. United States,* 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ("Accordingly, we hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."); *United States v. Wynn,* 684 F.3d 473, 478 (4th Cir.2012); *United States v. Jefferson,* 674 F.3d 332, 366 n. 45 (4th Cir.2012); *cf.* Oral Argument Tr. 24–25.

Second, Congress patterned section 1031 after sections 1341 and 1343. *See* S.Rep. No. 100–503, at 11 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5969, 5975 ("Subsection 1031(a) sets out the basic offense of major fraud against the United States.... The phrase 'scheme or artifice' should be interpreted in the same manner as that phrase is interpreted under the mail and wire fraud statutes, 18 U.S.C. [§§ ]1341 and 1343."). Indeed, the Senate report quotes the discussion in *McNally* in which the Court reasoned that the mail fraud statute was to be read as one offense and not two independent offenses, in direct contradiction of *Clausen's* reasoning. *Id.* at 11–12. This legislative history undermines the government's position concerning section 1031(a)(1) and its reliance on *Clausen.*

Third, the same reasoning that led the *Neder* Court to conclude that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes," *Neder,* 527 U.S. at 25, 119 S.Ct. 1827, applies to the major fraud statute in section 1031 and suggests that a material falsehood is required. The *Neder* Court explained, with respect to the mail, wire, and bank fraud statutes, that:

> [T]he well-settled meaning of "fraud" required a misrepresentation or concealment of *material* fact.... Thus, under the rule that Congress intends to incorporate the well-settled meaning of the common-law terms it uses, we cannot infer from the absence of an express reference to materiality that Congress intended to drop that element from the fraud statutes. On the contrary, we must *presume* that Congress intended to incorporate materiality unless the statute otherwise dictates.

*Id.* at 22–23, 119 S.Ct. 1827 (footnote and some quotations omitted). Although only subsection 1031(a)(2) explicitly mentions false pretenses or representations, subsection 1031(a)(1) requires a scheme or artifice "to defraud" the United States. 18 U.S.C. § 1031(a). "To defraud" suggests a misrepresentation or concealment of facts. *See Carpenter v. United States,* 484 U.S. 19, 27, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987); *Wynn,* 684 F.3d at 477–78. Thus, this court reads a scheme "to defraud" in section 1031(a)(1) to require a material misrepresentation or omission.[8]

---

**8.** One district court has described section 1031(a) in terms that arguably suggest that a material misrepresentation or omission is not required under subsection (a)(1). *See United States v. Frequency Elecs.,* 862 F.Supp. 834, 845 (E.D.N.Y.1994) ("[T]he [Major Frauds] Act criminalizes the execution or attempted execution of a scheme to defraud the United States OR to obtain money by false pretenses *from the United States.*" (emphasis added)). To the extent that this description, which fails to track the statutory language, implies that section 1031(a)(1) does not require a material misrepresentation or omission, this court respectfully disagrees.

In sum, section 1031(a)(1) requires a material misrepresentation or omission. *See, e.g., Neder,* 527 U.S. at 25, 119 S.Ct. 1827; *United States v. Reitmeyer,* 356 F.3d 1313, 1315–16, 1318–19 (10th Cir. 2004) (noting that an offense under section 1031(a) began to run when the defendants filed a false claim with the government because such conduct "first created a financial risk to the government *and involved an obligation to be truthful*"); *United States v. Best,* 219 F.3d 192, 195, 200 (2d Cir.2000) (affirming a conviction under section 1031(a)(1) where the defendant was charged with "aiding and abetting the submission of ... fraudulent claims" to a federal agency). If the government seeks a new indictment that charges defendants with violating section 1031(a)(1), it should proceed accordingly.

## IV.

In sum, the court GRANTS defendants' motions to dismiss the indictment [D.E. 28, 47] and DISMISSES without prejudice the indictment. The court DISMISSES the remaining motions [D.E. 48–49] as moot.